**UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JORGE CROSSWELL, GLORIA WANG, LA TRADE SUPPLIES, LLC, and GREEN WISDOM INDUSTRY, INC. *Plaintiffs* | § § § § § § | |
| v. | § § | **Civil Action No. 4:22-cv-01105** |
| JUAN CARLOS MARTINEZ CECIAS RODRIGUEZ; KARINA HERNANDEZ; CECILIA MIRANDA; JENNIFER GLEASON-ALTIERI; RHINOPRO CERAMICS, LLC; M&D CORPORATE SOLUTIONS, LLC; COMAR HOLINGS, LLC; MARA 6 HOLDINGS, LLC; MARA 6 INVESTMENTS, LLC; and RHINO LININGS CORPORATION | § § § § § § § § § § § | |
| *Defendants.* | § | |

**PLAINTIFFS JORGE CROSSWELL, GLORIA WANG, LA TRADE SUPPLIES, LLC
AND GREEN WISDOM INDUSTRY, INC.'S
RESPONSE TO DEFENDANT CECILIA MIRANDA'S MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM**

---

Plaintiffs, JORGE CROSWELL, GLORIA WANG, LA TRADE SUPPLIES, LLC AND GREEN WISDOM INDUSTRY, INC., file this response to Defendant CECILIA MIRANDA'S Brief in Support of her Motion to Dismiss for Failure to State a Claim:

## I.      OVERVIEW:

1.      Jorge Croswell ("Croswell"), Gloria Wang ("Wang"), LA Trade Supplies, LLC ("LA Trade Supplies") and Green Wisdom Industry, Inc. ("Green Wisdom Industry"), collectively referred to as "Plaintiffs," filed a Verified Complaint, by and through their undersigned counsel,

against Defendants Juan Carlos Martinez Cecias Rodriguez ("Martinez"), Karina Hernandez ("Hernandez"), Cecilia Miranda ("Miranda"), Jennifer Gleason-Altieri ("Gleason-Altieri"), RhinoPro Ceramics, LLC ("RPC"), M&D Corporate Solutions, LLC ("M&D or "M&D Corporate Solutions"), Comar Holdings, LLC ("Comar Holdings"), Mara 6 Holdings, LLC ("Mara 6 Holdings"), Mara 6 Investments, LLC ("Mara 6 Investments"), and Rhino Linings Corporation ("Rhino Linings"). In their Complaint, Plaintiffs allege that Defendant Miranda violated the Racketeer Influenced Corrupt Organizations Act; state claims for common law conspiracy, fraud, and fraud in the inducement; and seek recovery under the Texas Deceptive Trade Practices Act. Defendant Miranda responded to Plaintiffs' Complaint with a Motion to Dismiss for Failure to State a Claim. However, based on the proceeding arguments and authorities, dismissal of Plaintiffs' claims would be improper.

## ARGUMENTS AND AUTHORITIES:

### A.  RICO VIOLATIONS

2.      Plaintiffs allege that Defendant Miranda violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by participating in an enterprise which carried out a pattern of racketeering activity. *See* (Complaint, ¶53-56); 18 U.S.C. §1962. Contrary to Defendants' assertions, Plaintiffs' Complaint sufficiently states RICO claims against Defendant Miranda. *See* (MTD, ¶4-5).

   *a.   Plaintiffs Have Satisfied the Burden to State RICO Claim Against Defendant Miranda*

3.      Mail fraud, wire fraud, and immigration fraud each are enumerated as forms of "racketeering activity" under RICO. 18 U.S.C. §1341; 18 U.S.C. §1343; 18 U.S.C. §1425.  RICO prohibits the use of mails or wires "in furtherance of any scheme or artifice to defraud" and for purposes of "obtaining money … by means of false or fraudulent pretenses, representations, or

promises." *Skilling v. United States,* 561 U.S. 358, 399 (2010). Specifically, a "scheme or artifice to defraud" is "a scheme or artifice to deprive another of the intangible right to honest service." *Id.* In proscribing these statutes, Congress particularly intended to reach schemes involving bribes and kickbacks. *Id.* at 368. Comparably, in the present case, Defendants engaged in "a classic pyramid scheme." *See* (Complaint, ¶48); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 638-39 (5th Cir. 2016) (finding that, by design, pyramid schemes are "inherently fraudulent.")

4.      Mail fraud "applies to anyone who knowingly causes to be delivered by mail anything for the purpose of executing any scheme or artifice to defraud," *even if* the mailing itself contains no false information. *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015); *Schmuck v. United States,* 489 U.S. 705, 712 (U.S. 1989). Similarly, wire fraud involves the use of, or causing the use of, wire communications in furtherance of a scheme to defraud." *Allstate Ins. Co.*, 802 F.3d at 675. For pleading purposes, a plaintiff's claim of mail or wire fraud must be supported by the content of the alleged fraudulent communication and how that communication furthered the scheme to defraud. *Elliott v. Foufas,* 867 F.2d 877, 882 (5th Cir. 1989).

5.      The immigration fraud statute punishes "one who, whether for himself or herself or another person not entitled thereto, knowingly issues, procures, or obtains or applies for or otherwise attempts to procure or obtain naturalization … or any certificate or evidence of nationalization or citizenship." *United States v. Allouche,* 703 Fed. Appx. 241, 244 (5th Cir. 2017); 18 U.S.C. §1425. Stated differently, a claim of immigration fraud requires the following: 1) the defendant attempted to procure or obtain naturalization for himself or another; 2) the person for whom citizenship was sought was not entitled thereto; and 3) the defendant did so while knowing that he or another was not entitled to citizenship. *United States v. Moses,* 94 F.2d 182, 184 (5th Cir. 1996).

6.     To prove that fraudulent misrepresentation or concealment played a role in one's naturalization, a plaintiff must show that "the misrepresented fact was sufficiently relevant to a naturalization criterion" and that "an investigation [into the misrepresented fact] would have borne disqualifying fruit." *Maslenjak v. United States*, 137 S. Ct. 1918, 1921-22 (U.S. 2017). However, the plaintiff need not show that  investigation would have definitively unearthed disqualification; rather, the standard is whether a disqualifying fact would have been "*predictably* disclosed." *See id.* (emphasis added).

i.   Plaintiffs Adequately Allege Acts of Mail and Wire Fraud

7.     Plaintiff Croswell alleges that, on March 19, 2019, Hernandez sent him an email containing fraudulent representations about the investment and its rate of return. *See* (Complaint, ¶44). Specifically, the email urged Croswell "to sign the RhinoPro contracts soon, so that he would not lose out on the opportunity to invest as a part of a group of investors in the RhinoPro franchises" and assured him that "the franchises would provide a return of 11% annually." *See id.* The use of email correspondences advanced Defendants' scheme by allowing them to "communicate with investors," such as Croswell, about the investment opportunity. *See* (Complaint, ¶23). Significantly, Plaintiffs also allege that fraudulent visa applications, such as those prepared by Defendant Miranda, "were sent to USCUS through the U.S. mail." *See* (Complaint, ¶52).

8.     Defendants' misrepresentations caused investors to transfer funds to Defendants via wire transmissions. *See* (Complaint, ¶45). Specifically, Plaintiffs Croswell and LA Trade Supplies paid non-defendant Uberwurx "$25,000 on or about April 4, 2019, $15,000 on or about May 7, 2019, and $350,000 on or about July 19, 2019, for a total payout of $525,000." *See id.* Croswell also paid Corporate M&D Solutions, a company with which Defendant Miranda worked closely in carrying out her part of the scheme, "$20,000 for preparation of an EB5 visa application

and $4,000 for the preparation of a business plan for his RhinoPro franchises." *See* (Complaint, ¶50). All transfers of funds from Plaintiffs to Defendants occurred through banking wire services. *See* (Complaint, ¶52). The use of wires advanced Defendants' scheme by providing a means through which they could "transfer money from investors," like Plaintiffs, to Defendants. *See* (Complaint, ¶23, 45).

<strong>ii.  <u>Plaintiffs Adequately Allege Acts of Immigration Fraud</u></strong>

9.     Plaintiffs allege that Defendants targeted foreign investors, to whom they marketed a fraudulent "franchise" opportunity as a means of obtaining an E2 or EB5 visa. *See* (Complaint, ¶22). However, Miranda and her codefendants concealed the fact that investors "would be unable to manage their businesses themselves, as required for an E2 visa." *See* (Complaint, ¶47, 67). Though the scheme precluded investors from running their own companies, Defendants structured their transactions to make it appear as though the foreign individuals were running substantial businesses in the United States. *See id.* Plaintiffs claim that Defendant Miranda even prepared "sham business plans" to give the illusion of investor involvement. *See* (Complaint, ¶50-51, 67).

10.    Not only did Defendant Miranda assist in preparing sham business plans and fraudulent visa applications, but she also engaged the services of Jennifer Gleason-Altieri, an unlicensed attorney practicing in Texas. (Complaint, ¶50-51). Defendant Gleason-Altieri 'rubber-stamped' the fraudulent visa applications by signing off on them without determining if they were valid or not. *See id.* Moreover, Gleason-Altieri removed the MCM Management Agreement from investors' visa application documentation because, "its presence, if seen by the examining officer, would have resulted in the visa being denied." *See id.*

<strong>iii.  <u>Plaintiffs Plead Predicated Acts with Particularity Pursuant to Rule 9(b)</u></strong>

11.     A defendant who participates in a scheme to defraud is liable for *any* mail or wire communications which subsequently take place, or which previously took place, in connection with the scheme. *Allstate Ins. Co.,* 802 F.3d at 675; *Stalnaker,* 571 F.3d  at 436. Because a defendant need not personally handle the offensive mailing or wiring, a plaintiff "only must present enough evidence to connect the defendant to the fraudulent scheme." *Cadle Co.*, 779 F. Supp. 392, 399 (N.D. Tex. 1991); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983).

12.     To state a fraud-based claim under RICO, one must set forth the "who, what, where, when, and how of the alleged fraud." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003). However, the Fifth Circuit has recognized that a relaxed pleading requirement, one in which fraud may be pled on information and belief, is appropriate in cases where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp. 2d 1017, 1039 (S.D. Tex. 1998) (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067-68 (5th Cir. 1994)).

13.     In the present case, Plaintiffs identify the exact dates upon which the alleged mail and wire fraud took place, the specific Defendants directly involved in those acts, and the containments of both the offensive mailing and wiring. *See* (Complaint, ¶44-46). Further, Plaintiffs describe the overall scheme to defraud in detail, explaining the ways in which Defendants marketed and structured the scheme, interacted with investors, and engaged with codefendants in carrying out the scheme and making it appear legitimate. *See* (Complaint, ¶22, 27, 30-35).

14.     Plaintiffs need not show that Defendant Miranda personally committed acts of mail or wire fraud, so long as they demonstrate her participation in Defendants' overall scheme to defraud. Plaintiffs claim that Miranda actively participated in the scheme by creating sham

6

business plans, concealing material facts, engaging the services of Defendant Gleason Altieri, and preparing fraudulent visa applications to be sent to USCUS through the U.S. mail system. *See* (Complaint, ¶50-52, 67). According to Plaintiffs' Complaint, the fraudulent visa applications that Defendant Miranda prepared were sent to USCUS by the U.S. mail system. *See* (Complaint, ¶52). Also, Plaintiffs claim that Miranda's misrepresentations induced their investments in fraudulent RhinoPro franchises. *See* (Complaint, ¶67).

15.     Plaintiffs also detail Defendant Miranda's involvement in the act of immigration fraud. *See* (Complaint, ¶50-51, 67). Plaintiffs claim that, "when dealing with Mexican investors … Martinez and Hernandez coordinated with … Miranda … to prepare and file all necessary paperwork for investors to secure an E2 or EB5 visa from the United States Government." *See* (Complaint, ¶30). However, the only documents "prepared" or "filed" by Defendant Miranda were sham business plans and fraudulent visa applications. *See* (Complaint, ¶50-51). Plaintiffs allege that Defendants Miranda "represented that [she] would prepare and file Croswell's … applications" in a way that "would comply with federal law." *See* (Complaint, ¶67). Further, Plaintiffs claim that Miranda engaged the services of Defendant Gleason-Altieri to provide the fraudulent visa applications with an illusion of legitimacy and prepared sham business plans to make it appear as though investors were running their own businesses. *See* (Complaint, ¶47, 51, 67). However, Miranda failed to disclose that MCM's management would foreclose Croswell's E2 visa applications, since the use of a management company to oversee all operations …. violated U.S. immigration law." *See id.*

     iv.  <u>Plaintiffs Adequately Plead Proximate Cause Between Defendants'<br>Actions and The Injuries Alleged</u>

16.     To determine proximate cause for claims of mail and wire fraud, courts consider whether "the injury … was either a direct result or a reasonably probable consequence of the act."

*Torres*, 838 F.3d at 636; *See also Anza v. Ideal Steel Supply Corp.* 547 U.S. 451, 461 (U.S. 2006). Proximate causation "is a flexible concept that does not lend itself to black-letter rule" which will dictate the result in every case; it can be proven by circumstantial evidence. *Bridge*, 553 U.S. 639 at 654; *See also Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 965 (5th Cir. 2019).

17.     "Regardless of how proximate cause is sliced," the 5th Circuit found it in the *Allstate* case, where the Court held that payments are not merely "incidental" when "paying up … [is] the object of the collaboration." *Allstate Ins. Co.*, 802 F.3d at 676. In other words, "there was no plausible argument that insurers were unforeseeable victims or … wronged by the caprice of chance" when "the objective of the [scheme] was to collect from insurance companies." *See id.* Similarly, the *Daniel* court held that proximate cause is adequately pled when the pursuit of a predicated act "was reasonably foreseeable to [the defendant]" and the alleged act occurred in furtherance of the scheme. *See United States v. Daniel*, 749 F.3d 608, 615 (7th Cir. 2014).

18.     As in *Allstate,* Plaintiffs losses cannot be considered merely "incidental" when their "paying up" was the entire objective of Defendants' scheme. *See* (Complaint, ¶31-32, 45, 50*)*; *See also Allstate Ins. Co.*, 802 F.3d at 676. Because Defendants aim to fraudulently convince investors to invest money into so-called "franchises," Plaintiffs' loss of funds cannot be considered an unforeseeable consequence. *See* (Complaint, ¶1, 31-32). Defendants specifically target "foreign national investors who were looking to open a business in the United States." *See* (Complaint, ¶27). As in *Daniel,* Plaintiffs fit the description of a "foreseeable victim" of Defendants' scheme. *See* (Complaint, ¶2-3); *See also Daniel*, 749 F.3d at 615.

19.     Plaintiffs must plead some sort of causal relationship between the false statements and the attempted acquisition of citizenship. *United States v. Nepal,* 894 F.3d 204, 209 (5th Cir. 2018). In other words, courts must determine whether the facts would have affected a reasonable

government official in properly applying naturalization law. *See id.* To establish foreseeability, a plaintiff need not show that the defendant a*nticipated* the precise consequences of his actions; rather, the plaintiff merely must demonstrate that the defendant *should* have anticipated the dangers of his actions. *Hoe v. Appleman,* 2022 U.S. Dist. LEXIS 111191, *14 (N.D. Tex. 2022).

20.     Here, Plaintiffs allege that "the whole reason for [their] investing in the RhinoPro Mobile franchises – to operate a business that would qualify [them] for an E2 or EB5 visa – was frustrated by the business model Martinez and his coconspirators sold." *See* (Complaint, ¶47). Thus, Defendant Miranda's failure to disclose that Plaintiffs would be unable to manage their own businesses was not only material, but a direct cause of Plaintiffs' losses. *See* (Complaint, ¶67).

21.     Further, Plaintiffs claim that the fraudulent visa applications, prepared by Defendant Miranda, would have affected a reasonable government official in properly applying naturalization law. *See* (Complaint, ¶51). Plaintiffs allege that Defendant Gleason-Altieri, whose services were engaged by Defendant Miranda, "removed the MCM Management Agreement from Plaintiffs' E2 file because its presence, if seen by the examining officer, would have resulted in the visa being denied." *See id.* Specifically, its presence would have revealed that Plaintiffs were unable to manage their own businesses, as is required for an E2 visa. *See* (Complaint, ¶47).

22.     Plaintiffs' injuries should have been foreseeable to Miranda, as Defendants' scheme had already defrauded dozens of investors over several years. *See* (Complaint, ¶23). Miranda's failure to disclose that MCM's management would foreclose Plaintiffs' applications, as well as her preparation of sham business plans and engagement of Gleason-Altieri, demonstrate her anticipation of the consequences that, ultimately, came into fruition. *See* (Complaint, ¶50-51, 67).

v.   <u>Alternatively, Plaintiffs Request to Amend Their Complaint Pursuant to Rule 15(a)(2)</u>

23.     Pursuant to Rule 15(a)(2), a party may amend its pleading with either the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(2). Upon request, "the court should freely give leave when justice so requires." *See id.* The Federal Rules reject the idea that "pleading is a game of skill in which one misstep by counsel [is] decisive to the outcome." *See Megatel Homes, LLC*, U.S. Dist. LEXIS 220822, *25 (quoting *Foman v. Davis* 371 U.S. 178, 181-82 (U.S. 1962). Rather, "[its] purpose is to facilitate a proper decision on the merits." *See id.* For this reason, the Supreme Court recognizes that refusal to grant leave, absent any justification, is "inconsistent with the spirit of the Federal Rules." *See Foman,* 371 U.S. at 182.  Thus, even *if* Plaintiffs' claims do not meet Rule 9(b) standard, dismissal would be improper at this stage in the proceedings. Alternatively, Plaintiffs request to amend their pleading, as they "ought to be afforded an opportunity to test [their] claim[s] on the merits." *See id.*

### b.   *Plaintiffs Adequately Plead a Pattern of Racketeering Activity*

24.     "A pattern of racketeering activity" is defined as a "series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329 (U.S. 2016); 18 U.S.C. 1961(5). Specifically, a pattern is shown by at least two predicated acts committed within ten years of one another. *See id.*

25.     There are two ways in which a plaintiff may demonstrate a threat of continuity: (1) "a closed period of repeated conduct;" and (2) "an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016) (quoting *H.J. Inc. v. Nw. Bell  Tel. Co.*, 492 U.S. 229, 239 (U.S. 1989)). The open-ended approach permits plaintiffs to establish continuity by showing that either a "threat of repetition extends indefinitely into the future" *or* "the activities are regular way of conducting [an] ongoing legitimate business." *See id.*

26.     For pleading purposes, a plaintiff need not tie their allegations to precise language, but rather, to a general explanation of the statute. *Abraham v. Singh,* 480 F.3d 351, 356 (5th Cir. 2007). The standard for pleading a pattern of racketeering activity depends on the "specific facts of each case and cannot be fixed in advance with such clarity that it will always be apparent." *See id.* For this reason, the Fifth Circuit urges courts to consider past precedent when determining whether a threat of continuity exists. *See id.*

27.     In *Abraham,* the Fifth Circuit found a pleading to be sufficient when it alleged that the defendants "engaged in at least a two-year scheme" in which they convinced "Indian citizens to borrow thousands of dollars to travel to the United States only to find upon their arrival that things were not as they had been promised." *See id.*  Likewise, in the present case, Plaintiffs allege that Defendants' scheme has been in operation for several years, during which it has already victimized dozens of investors through mail, wire, and immigration fraud. *See* (Complaint, ¶22). However, despite their investments, victims of the scheme do not receive the franchises nor profits that they were promised. *See* (Complaint, ¶33, 47-48). Moreover, the fraudulent franchise mechanism is *not* "one hundred percent effective at receiving E2 and EB5 visa approval," despite Defendants assurances. (Complaint, ¶49). Plaintiffs claim that this misrepresentation frustrated the whole reason for their investment, as well as the investments of many others. (Complaint, ¶47).

28.     Thus, Plaintiffs adequately plead a "pattern of racketeering activity," which represents the regular way in which Defendants conduct their business. *See Abraham v. Singh,* at 356; *Malvino,* 840 F.3d at 231. As in *Abraham,* we cannot assume that the regularity of Defendants' "systematic victimization" will not continue indefinitely into the future if not stopped. *See Abraham,* 480 F.3d at 356.

   c.   *Plaintiffs Sufficiently State a Claim for Conspiracy Pursuant to 18 U.S.C. §1962(d)*

11

29.     To state a claim under §1962(d), a pleading must support the inference that (1) two or more people agreed to commit a substantive RICO offense; and (2) co-conspirators knew of and agreed to the overall objective of the offense. *Megatel Homes, LLC*, U.S. Dist. LEXIS 220822, *21 (quoting *United States v. Sharpe,* 193 F.3d 852, 869 (5th Cir. 1999)). "Because conspirators normally attempt to conceal their conduct," conspiracy may be established solely by circumstantial evidence. *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

30.     A conspirator need not agree to each and every part of the substantive offense upon which the claim is based. *See id.* (quoting *Salinas v. United States*, 522 U.S. 52, 118 (1997)). "There is no requirement that that the conspirator 'have committed or agreed to commit the two predicated acts;' instead, the conspirator 'need only have known of and agreed to the *overall objective* of the RICO offense.'" *Sullo v. Kubosh,* 616 S.W.3d 869, 895 (Tex. Ct. App. 2020) (quoting *United States v. Delgado,* 401 F.3d 290, 296 (5th Cir. 2005) (emphasis added).

31.     Though some conspiracies "have many illegal objectives … necessarily involv[ing] a number of sub-agreements," they are treated as "one conspiratorial web." *See United States v. Faulkner,* 17 F.3d 745, 760 (5th Cir. 1994). For example, courts have found a single conspiracy in cases "where the activities of one aspect of the scheme are necessary or advantageous" to either another aspect or the scheme's overall objective, courts have found the existence of a single conspiracy. *See id.* Stated differently, an act committed by one conspirator is attributable to all conspirators, even those who only agreed to some of the conspiracy's many objectives. *See id.*

32.     "The agreement, a defendant's guilty mind, and a defendant's participation" in a RICO conspiracy "may all be inferred from the development and collocation of circumstances." *United States v. Perry,* 35 F.4th 293, 318 (5th Cir. 2022); *See  Delgado,* 401 F.3d at 857; *See also Posada Rios,* 158 F.3d at 857-58. For instance, a conspirator's presence at or association with a

conspiracy may be an indicative factor of knowledge or agreeance. *Faulkner,* 17 F.3d at 760. Additionally, the "overlapping nature" of a coconspirator's participation in a conspiracy with that of other members may necessarily imply their guilty mind. *Id.* Thus, Defendant Miranda may be held liable for violations of RICO, regardless of whether she personally committed or consented to the substantive underlying acts, so long as she agreed to one of the scheme's objectives. *See id.*

33.   Based on the facts alleged in Plaintiffs' Complaint, Defendant Miranda's knowledge of or agreeance to *at least* one of the scheme's objectives may be inferred. *See* (Complaint, ¶50-52); *See Faulkner,* 17 F.3d at 760. Miranda's participation in Defendant's scheme to defraud, in itself, may be indicative of her knowledge or agreeance to its overall objective. *See id.* More significantly, however, are the facts pertaining to Defendant Miranda's role within the conspiracy and relationship to other coconspirators. *See id.* For example, "Defendant Miranda had … Croswell engage the services of Jennifer Gleason-Altieri," an attorney who practiced immigration law in Texas despite not having the license to do so. *See* (Complaint, ¶50); Defendant Miranda link to Gleason-Altieri's services was essential to the approval of disqualifying documents from investors' visa applications. *See* (Complaint, ¶51).

34.   Miranda functioned within the common scheme of conspiracy in a way that overlapped with its other members, working closely with Defendants Martinez, Hernandez, Corporate M&D Solutions, and Gleason-Altieri during her dealings with foreign investors. *See* (Complaint, ¶30, 50-52, 47). Defendant Miranda's connection to coconspirators and the furtherance of their scheme are sufficient to imply a guilty mind. *See id.; Faulkner,* 17 F.3d at 760.

**B. COMMON LAW CONSPIRACY**

35.   The elements of common law conspiracy are as follows: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4)

one or more unlawful, overt acts; and (5) damages as a proximate result." *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). As a derivative tort, conspiracy requires a separate underlying claim upon which the court may grant relief. *See Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996).

36.     "A co-conspirator is bound by the overt acts of other conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the time." *Newby v. Enron Corp. (*citing *In re Enron Corp. Secs.,* Derivative & ERISA Litig.), 762 F. Supp. 2d. 942, 971 (S.D. Tex. 2010). "It is not essential that each conspirator have knowledge of the details [of the conspiracy]." *J.T.T. v. Tri,* 111. S.W.3d 680, 684 (Tex. Ct. App. 2003). Once the existence of a common scheme of conspiracy is shown, only "slight evidence is … required to connect a particular defendant [to] the conspiracy." *See Newby v. Enron Corp.,* at 971.

37.     Texas courts have established that, in order to state a claim of common law conspiracy, a plaintiff must allege "a preconceived plan and unity of design and purpose." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968). However, these allegations may be, and usually must be, based upon circumstantial evidence. *Id.* at 858. The requisite "plan" and "unity" may be shown by "an agreement or understanding between the conspirators to inflict a wrong against, or injury to, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act." *See id.*at 857.

      i.     Plaintiffs' Allegations Adequately Link Defendant Miranda to a Common Scheme of Conspiracy

38.     Plaintiffs adequately allege the existence of an "agreement," or an "understanding to inflict a wrong against, or injury to, another" between Defendants Martinez, Miranda, and Gleason-Altieri.   Courts often find that merely "'showing that the alleged conspirators have

committed acts that are unlikely to have been undertaken without an agreement may allow the inference of a conspiracy." *See Jones v. Hawk-Sawyer,* 2000 U.S. Dist. LEXIS 23326, *13 (N.D. Tex. 2000) (quoting *Kunik v. Racine County,* 946 F.2d 1574 (7th Cir. 1991)). However, Plaintiffs also allege that "the scheme has been in operation for several years," during which it has already "victimized dozens of investors." *See* (Complaint, ¶23). During the course of its operations, Martinez and Hernandez are alleged to "coordinate with" Defendant Miranda "when dealing with Mexican investors." *See* (Complaint, ¶30). The alleged longevity of the scheme's operations and victimizations, coupled with the alleged consistency of Defendant Miranda's involvement therein, implies the existence of an agreement or preconceived plan between Miranda and her coconspirators. *See* (Complaint, ¶23, 30).

39. Plaintiffs allege a "meeting of the minds" between Defendants Martinez and Miranda. Specifically, they assert that, "when dealing with Mexicans investors, Martinez and Hernandez coordinated with" Defendant Miranda "to prepare and file all necessary paperwork for investors to secure an E2 or EB5 visa." *See* (Complaint, ¶30). In assisting with the preparation of Plaintiff Croswell's limited liability company, bank account, and visa application. Put simply, Martinez asked for assistance with certain activities, which Defendant Miranda delivered. *See id.* This demonstrates a "meeting of the minds" as to a common course of action. *See* (Complaint, ¶30, 50).

40. Finally, Plaintiffs describe the co-conspirators' shared intent to commit the injurious acts. Plaintiffs claim that Defendants Martinez, Miranda, and Corporate M&D Solutions all failed to disclose that Croswell would be unable to manage his own company. Plaintiffs allege that Defendants withheld this information because they knew that the oversight of a management company would disqualify Croswell's visa application from approval. *See* (Complaint, ¶47, 67).

To provide an illusion of legitimacy, Defendants Miranda and Corporate M&D Solutions prepared a sham business plan for Croswell. *See* (Complaint, ¶67). Relatedly, Martinez sold the business model while using structured transactions to make it appear as though investors would be involved. *See* (Complaint, ¶47). Taken together, these facts raise the inference of a shared intent to defraud.

## C. RECOVERY UNDER DTPA

41.     The Deceptive Trade Practices Act ("DTPA") was designed to address unfair or deceptive trade practices, particularly those that cause likelihood of confusion, misunderstand, or inference with another's business. To promote its "underlying purpose of protecting consumers against false, misleading, and deceptive business practices," the language of the DTPA is intended to be "construed liberally." *Chastain v. Koonce*, 700 S.W.2d 578, 591 (Tex. 1985). Under the Act, a "consumer" is defined as any individual who seeks or acquires, by purchase or lease, any goods or services. *See id.* at 581. More specifically, "goods" are chattels or real property purchased or leased for use, and "services" are work, labor, or services purchased or leased for use. *Hand* v. *Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 496-97 (Tex. Ct. App. 1994).

42.     Deceptive trade practices, as defined by the DTPA, include the following activities: (1) representing that certain goods or services have a sponsorship, approval, status, affiliation, or connection when they do not; (2) representing that certain goods or services are of a particular standard, quality, or grade, when they are of another; and (3) advertising certain goods or services without intending to sell them as advertised. Tex. Bus. & Com. Code Ann. § 17.46(b)(5)-(9). Defendant Miranda made each of these material misrepresentations during the course of her dealings with Plaintiffs Croswell and LA Trade Supplies.

43. "DTPA claims are not fraud claims. Thus, Rule 9(b)'s provisions do not necessarily apply." *Grosser v. Red Mango FC, LLC,* 2013 U.S. Dist. LEXIS 201657, \*16-17 (N.D. Tex. 2013) (citing *Lone Star Ladies Investment Club v. Schlotzsky's, Inc.,* 238 F.3d 363, 368 (5th Cir. 2001).

44. Indeed, Defendant Miranda neither is nor claimed to be an attorney; however, this does not negate her liability as a business consultant. *See* (MTD, ¶36-37). Defendant Miranda was responsible for more than just "preparing fraudulent visas" for Defendants' scheme to defraud; she also assisted investors throughout the process of setting up their businesses. \*\*

45. For instance, Defendant Miranda is alleged to have assisted with setting up investor banks accounts and limited liability companies, which she is alleged to have represented as means through which investors could "run" and "operate" their RhinoPro business. *See* (Complaint, ¶30). She is also alleged to have represented her services and providing "viable and workable" business plans to investors. *See* (Complaint, ¶67).

46. As a consultant to investors, Miranda engaged in deceptive trade practices by falsely representing her services as of a standard or quality of which they are not. Tex. Bus. & Com. Code Ann. § 17.46(b)(5)-(9). Instead of a "viable and workable" business model, Plaintiffs allege that Miranda provided a "sham business plan" to Plaintiffs Croswell/LA Trade Supplies and other investors. *See* (Complaint, ¶67, 51). Additionally, Plaintiffs claim that Defendant Miranda advertised her services in a way that she did not intend to provide. For instance, Miranda prepared business plans, which were designed to make it appear as though investors would be involved in their own business; however, she did not disclose the fact that investors would be unable to manage their own business pursuant to their contracts. *See* (Complaint, ¶67). She also failed to disclose that oversight of a management company would disqualify investors' visa applications from approval. *See id.*

### D. FRAUD & FRADULENT INDUCEMENT

47.     Under Texas law, the elements of fraud are: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Johnson v. World Alliance Fin. Corp.*, 830 F.3d 192, 198 (5th Cir. 2016). Fraudulent inducement shares these same elements but adds a requirement that the fraud relate to an agreement between the parties. *See id.*

> i.   Plaintiffs Plead Particular Facts Describing Defendant Miranda's Fraudulent Conduct

48.     To state a claim for fraud, the general rule is that a material misrepresentation must be made. *See id.* However, several courts often consider the failure to disclose information in business transaction settings as material misrepresentation *See Hogget v. Brown,* 971 S.W.2d 472, 487 (Tex. App. Ct. 1997); *See also Ralston Purina Co. v. McKendrick,* 850 S.W.2d 472, 487. In these cases, the defendant might not have made an *affirmative* representation; however, what is said is misleading because other facts were not disclosed. *See id.*

49.     Comparably, Defendant Miranda made representations of a "viable and workable" business plan for investors, including Plaintiffs Croswell/LA Trade Supplies; however, she failed to disclose the fact that investors are unable to manage their companies pursuant to the MCM Management Agreement. *See* (Complaint, ¶67). Not only was the business plan neither viable nor workable, but Miranda's concealment of critical information was also a misrepresentation. *See id.* Miranda's omission was material to Croswell, who alleges that the "whole reason" for his investment was to "run the business himself" and "operate a business that would qualify for an E2 or EB5 visa." *See* (Complaint, ¶47).

50.     Plaintiffs also claim that Defendant Miranda engaged the services of Defendant Gleason-Altieri, while making representations that Croswell's visa application preparation "would comply with federal law." *See* (Complaint, ¶67, 50). At the very least, Miranda's representations of compliance and legality imply a basis of knowledge as to Gleason-Altieri's license, or lack thereof, to practice immigration law in Texas. *See id.* Additionally, Plaintiffs indicate that Miranda made representations regarding both RhinoPro "franchises," which were actually licenses, as well as the purpose of setting up a bank account and limited liability company. *See* (Complaint, ¶30, 50).

51.     Contrary to Defendant's assertions, Plaintiffs plead their fraud-based claims with sufficient particularity to provide Miranda with notice of the time, place, contents of, parties to, and deceit of the alleged fraudulent communications. *See* (MTD, ¶22); *See also Tel-Phonic Serv's, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1138-39 (5th Cir. 1992). As described above, the Complaint clearly specifies the *parties* between which the fraudulent communications were made – Defendant Miranda, Plaintiffs Croswell/LA Trade Supplies and, at times, other named Defendants. Additionally, Plaintiffs set forth facts regarding the c*ontent* of each representation or omission and explain the reasons for which it was fraudulently conveyed or concealed. When fraudulent communications occurr across state or international borders, courts find that the *place* of correspondence has been sufficiently pled when a plaintiff specifies the means of communication, as well as the state or city from which the correspondence was sent and that in which it was received. *See Pierce v. Aircraft Fin. Corp. LLC,* 512 F. Supp. 753, 763-64 (S.D. Tex. 2021). Accordingly, Plaintiffs allege that all communications between Defendants and investors occurred through "postal service, email, telephonic communications, and banking wire services." *See* (Complaint, ¶1). They also specify that Defendant Miranda resides in Houston, while Plaintiff

Croswell resides in Mexico. *See* (Complaint, ¶2, 8). Lastly, Plaintiffs specify the period of *time –* from March to August of 2019 – during which the communications occurred. *See* (Complaint, ¶24-35).

52.     Notably, courts often relax the requirements of the heightened Rule 9(b) standard, often accepting allegations based upon information and belief, in cases where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *United States ex. rel. Thompson v. Columbia/HCA Helathcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

> ii.   Plaintiffs Allege The Requisite Intent To State a Claim of Fraud in the Inducement Against Defendant Miranda

53.     For claims of fraudulent inducement, "intent to deceive" may be established by circumstantial evidence such as the defendant's actions preceding the fraudulent representation or omission. *See Arete Partners LP v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). Intent is determined by a defendant's state of mind at the time a representation was made or at the time information was omitted from disclosure. *See Formosa Plastics Corp. USA v. Presidio Engineer*s *& Contractors,* 960 S.W.2d 41 (Tex. 1998). Breach of an agreement alone is not evidence of fraudulent inducement; however, breach combined with "slight evidence" of fraudulent intent is sufficient to support a finding of fraudulent inducement. *See id.* I

54.     Accordingly, in their Complaint, Plaintiffs plainly state that the purpose behind Defendant Miranda's misrepresentations and omissions was "to induce Croswell/La Trade Supplies intro retaining them to form LA Trade Supplies and prepare Croswell's E2 and EB5 visa applications." *See* (Complaint, ¶61).

55.     Miranda's representations of visa preparation that "would comply with federal law" and a business plan that was "viable and workable" business plan were material as to Plaintiffs Croswell/LA Trade Supplies, who allege that the "whole reason." for their investment was "to

qualify for an E2 or EB5 visa." *See* (Complaint, ¶47, 61, 67).  Additionally, Miranda's failure to disclose that investors would be unable to run their own business is exactly the kind of material omission that amounts to fraud.  *See Hogget,* 971 S.W.2d at 487; *See also Ralston Purina Co.,* 850 S.W.2d at 487. Much like her affirmative misrepresentations, Miranda's nondisclosure was material to Croswell, who wanted to "run [his] business himself." *See* (Complaint, ¶47).

Respectfully submitted,

SERNA VETHAN, PLLC

By: /s/ *Joseph L. Lanza*

Charles M.R. Vethan
Texas Bar No. 00791852
Email: cvethan@vethanlaw.com
Joseph L. Lanza
Texas Bar No. 00784447
Email: jlanza@vethanlaw.com
Two Memorial City Tower
820 Gessner, Suite 1510
Houston, Texas 77024
Telephone: (713) 526-2222
Facsimile: (713) 526-2230

Daniel E. Serna
Texas Bar No. 24046821
Email: dserna@vethanlaw.com
Fountainhead Tower
8200 IH 10 West, Suite 320
San Antonio, Texas 78230
Telephone: (210) 824-2220
Facsimile: (713) 526-2230
Service email: edocs@vwtexlaw.com

***Attorneys for Plaintiffs***

CERTIFICATE OF SERVICE

I certify that on the 28th Day of October 2022, a true and correct copy of the foregoing was served via the Court's ECF system of all counsel of record herein.


By: /s/ *Joseph L. Lanza*

Joseph L. Lanza